## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Matthew B. Flynn, depose and state as follows:

## AGENT BACKGROUND

1.      I am a Task Force Officer of the Federal Bureau of Investigation ("FBI") and have been so employed since October 2020. I am currently assigned to the FBI's New Hampshire Major Offender Task Force ("NHMOTF") where I am tasked with investigating violent criminals, gang members, and significant drug traffickers throughout the state. As part of the NHMOTF, I work alongside law enforcement officers from various local, state, and federal agencies throughout the state of New Hampshire. I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2.      In addition to my Task Force Officer ("TFO") assignment, I am a detective at the Hudson, New Hampshire Police Department where I have been employed since August 2015. I am a full-time certified police officer and completed the full-time police academy, class 168, by the New Hampshire Police Standards and Training Council.

3.      Throughout my career, I have led and/or been involved with investigations of drug distribution, violent crimes, and other offenses. My investigations have included the use of the following investigative techniques: physical surveillance; handling of cooperating sources and witnesses; exploitation of cellular and social media; financial data analysis investigations; execution of search and seizure warrants, and the execution of arrest warrants. During numerous previous investigations, I have been the affiant on both Federal and State search and arrest warrants. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the commission of

various criminal offenses, such as those related to acts of violence, firearms, and controlled substances.

## PURPOSE OF AFFIDAVIT

4.      I submit this affidavit in support of an application for a warrant to search the following premises:

      a.      126 Hall Street, Concord, New Hampshire Unit A ("Target Premises").

5.      The one –story industrial style building contains multiple units with front and rear access.   Unit A is the end unit on the northeastern side of the building. Unit A is publicly portrayed to be an auto mechanic shop named Northern European Automotive Inc; however, it is registered as M.A.B Autoworks[1]. Unit A has an office-style entry on the northwestern side of the building, and a garage door and an access door on the southeastern side. Unit A has onsite parking on the northwestern and southeastern side of the property utilized by the property users, as observed by physical surveillance. This warrant seeks permission to search only Unit A and the areas on the curtilage of the Unit that are attributable to occupants of Unit A (closets, storage areas, etc.).

6.      Based on the information contained herein, there is probable cause to believe that Target Premises, described in Attachment A, contains evidence, fruits, and instrumentalities as further described in Attachment B of the crimes of 21 U.S.C. §§ 841 & 846 [Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances] committed by Serene Hull and others.

---

[1] The auto body shop was formerly registered with the New Hampshire Secretary of State ("NHSOS") as Northern European Automotive, Inc. with McLean as the listed Principal. It is currently registered with NHSOS as M.A.B. Autoworks, LLC with Burney as the listed Principal. However, the shop is still sometimes referred to as NEA. For the purpose of this affidavit, the auto body shop will be referred to as MAB. It is believed MAB does perform very limited mechanical work but is primarily a place used for the distribution of controlled substances.

7.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

## **PROBABLE CAUSE**

8.      On February 2, 2023, investigators met with a cooperating witness ("CW-4")[2], who stated that he/she had purchased approximately one half-ounce of methamphetamine from the Target Premises approximately 7-8 times.[3] CW-4 stated that his/her associate arranged the first four or five deals at the Target Premises. However, the most recent three deals were arranged by CW-4 with Hull through Hull's phone number – 603-223-7651("TT-7651").[4] Hull would charge CW-4 approximately $500 per half-ounce of methamphetamine.

9.      CW-4 explained that when visiting the shop, he/she would enter through the front door and walk directly to Hull's office in the back. CW-4 only visited the Target Premises to obtain controlled substances. CW-4 estimated that he/she has seen upwards of approximately one kilogram of heroin/fentanyl, one kilogram of methamphetamine, and a large bowl filled with powder cocaine in Hull's office. CW-4 has also observed Hull cooking powder cocaine into crack

---

[2] CW-4 has been cooperating with law enforcement since approximately January 2023 when approximately one half-ounce of methamphetamine was seized from CW-4. CW-4 is motivated to work with law enforcement solely in hopes of consideration in that uncharged incident. CW-4 has not received any monetary payments.  Since becoming a cooperating witness, CW-4 has not, to the knowledge of law enforcement, utilized controlled substances, nor has CW-4 conducted any purchases of controlled substances without law enforcement direction. CW-4 has been arrested for the following offenses: Possession Class B [U] (MA MGL C94C); Failure to Make Restitution [M] (NH RSA 651:67); Possession Controlled Drug [M] (NH RSA 318-B:2); Driving or Operating Under the Influence [M] (NH RSA 265-A:2); Simple Assault [M] (NH RSA 631:2-a); and Disobeying Police Officer [M] (NH RSA 265:4). CW-4 has not been convicted of all the previously mentioned charges. CW-4 has provided information related to criminal activity which has been corroborated by law enforcement. For example, when CW-4 first agreed to cooperate, CW-4 identified Hull as a distributor of controlled substances which was consistent with evidence later developed in this investigation and described herein.

[3] Prior to this date, law enforcement was investigating Hull for her involvement in drug trafficking.   Specifically, on November 10, 2022, law enforcement executed a search warrant for a package destined for California sent from the Target Premises containing a pressure cooker with $22,080 hidden within it. Based on information obtained from another cooperating witness, this money was destined for a drug supplier.

[4] An analysis of toll records indicated CW-4 began communication with TT-7651 on January 24, 2023 and communicated with TT-7651 on five separate days up until the date law enforcement encountered CW-4.

cocaine on at least one occasion.

10.     During the morning of February 9, 2023, law enforcement directed CW-4 to arrange the purchase of methamphetamine with Hull over TT-7651. CW-4 provided a screenshot of the text messages which were manually confirmed to have been sent to and from TT-7651. The text messages, below, are consistent with general inquiries CW-4 has made in the past prior to visiting the Target Premises to purchase methamphetamine:

- CW-4: Can I ce [sic] by later on? Was hoping for around 430-5
- TT-7651: I will be I. [sic] Berlin but none [sic] of my guys will be here
- TT-7651: I will make sure of it
- CW-4: Will be?

11.     Later that day at approximately 4:29 p.m., CW-4 was directed by law enforcement to make a recorded phone call to Hull over TT-7651 to confirm the previously arranged purchase of one ounce of methamphetamine. Law enforcement visually observed CW-4 dial TT-7651 and confirmed the call via toll record analysis. The following conversation took place, wherein I believe Hull confirmed someone would be at the Target Premises to conduct the transaction with CW-4:

- CW-4: I'm gonna be there in like twenty minutes, is everything good?
- Hull: (Inaudible)
- CW-4: Am I all set?
- Hull: What was that? Sorry I can't hear you.
- CW-4: Am I, am I good to go by?
- Hull: I can't understand you, what?
- CW-4: Am I all set?
- Hull: Are you all set to the shop? Yeah.
- CW-4: Okay, okay, just wanna make sure.
- Hull: (Inaudible) be there for you.
- CW-4: Okay thank you.
- Hull: You're welcome.

12.     Following the conversation between CW-4 and Hull over TT-7651, CW-4 was followed by law enforcement to the Target Premises to conduct the controlled purchase of

methamphetamine[5]. CW-4 entered the Target Premises at approximately 5:00 p.m. and exited approximately three minutes later. CW-4 then met with law enforcement and turned over approximately one ounce of a substance which field-tested positive for methamphetamine[6]. CW-4 reported that an unknown male let he/she into the Target Premises and directed to Hull's office. While in the office, an unknown male accessed a filing cabinet and asked CW-4 if he/she wanted "two," to which CW-4 stated he/she only wanted "one." The male then stated he had turned down a couple customers because he thought CW-4 wanted more. CW-4 provided the male with $700 and received the suspected methamphetamine.

13.    On March 6, 2023, Federal District Judge Samantha Elliott granted investigators the authority to initiate interceptions of wire and electronic communications over Thomas Conway's telephone number 603-661-7903 ("TT-7903").   On March 9, 2023, a text message conversation was intercepted by law enforcement over TT-7903 with TT-7651. I believe the conversation, listed below, consisted of a request by Conway to purchase a small amount of heroin/fentanyl from Hull:

- TT-7903: Hey serene. I know Alton[7] is in the clink right now but I wanted to know if you had any down, just like a stick or two
- TT-7651: Yes i do i am headed to berlin but tony is at the shop he can help you
- TT-7903: It's gonna take me an hour or so though
- TT-7903: Ok I'll come by the shop and ask for Tony

14.    Based on surveillance observations of Conway and other interceptions over TT-7903, I know Conway did not meet with Hull on March 9, 2023.

15.    On March 11, 2023, law enforcement directed CW-4 to contact Hull via text message at TT-7651 to inquire about visiting the Target Premises. CW-4 informed investigators

---

[5] For all of the controlled purchases described herein, a set of standard protocols was employed to ensure the evidentiary reliability of the purchase. Each time, the CW was searched prior to the purchase to ensure that he/she had only the necessary buy money and no pre-existing drugs. Each CW was provided a concealed audio and/or video recorder to record the transaction. CW was followed away from the location to a pre-determined location, where the substance purchased was immediately turned over to law enforcement.

[6] All of the suspected controlled substances described herein were sent to a law enforcement laboratory for chemical analysis. Results are pending.

[7] "Alton" as referenced in this affidavit is believed by investigators to refer to Alton Ryan, who was arrested prior to this text exchange.

that in the past, he/she would ask Hull for an oil change as a way to encode the actual meaning of his/her visits to the Target Premises. Consequently, CW-4 sent a text message to TT-7651 which read, "Yo, can I come through for a whole oil change." The term "whole" was used by CW-4 to describe the "oil change" as a reference to a whole ounce of methamphetamine. CW-4 received a text message back from TT-7651 which read, "Yes." Toll analysis confirmed these messages were in fact sent to and from TT-7651.   There was no drug transaction on this date.

16.     On March 16, 2022, law enforcement directed a cooperating witness ("CW-1")[8] to contact Conway over TT-7903 and request to purchase 200 grams of heroin/fentanyl. These communications were intercepted by law enforcement over TT-7903. Soon after the request from CW-1, law enforcement intercepted the following text message conversation between TT-7903 and TT-7651 which concluded at 11:50 a.m.:

- TT-7903: Are you gonna be at the shop today? I wanted to stop by and talk with you.
- TT-7651: Leaving for berlin at 1
- TT-7903: I'm trying to grab some down for a guy who normally grabs from A[9]. I've got like 2000 but I'm supposed to get 150 per stick on purchase tonight. Can I pay half now and half after I sell it? I need 20 sticks
- TT-7903: If so I can come up there before you leave at 1
- TT-7651: Let me see what i can do
- TT-7903: Okay
- TT-7651: I dont think i have rhst [sic] many left
- TT-7903: Thanks for whatever you can do. How many can you do? I guess I'll have to renegotiate with the guy

---

[8]  CW-1 has been cooperating with law enforcement since approximately October 2022. Prior to agreeing to cooperate with law enforcement, CW-1 was arrested for possession of methamphetamine and is motivated to work with law enforcement solely in hopes of consideration in that case. CW-1 has not received any monetary payments.   Since becoming a cooperating witness, CW-1 has not, to the knowledge of law enforcement, utilized controlled substances, nor has CW-1 conducted any purchases of controlled substances without law enforcement direction. CW-1 has been arrested for the following offenses: Driving After Suspension [M] (NH RSA 263:64), False Report to Law Enforcement [M] (NH RSA 641:4, I), Burglary [M] (NH RSA 635:1, V), Transporting Drugs [M] (NH RSA 265-A:43), Possession of Controlled Drug [F] (NH RSA 318-B:2,I), Disobeying an Officer [M] (NH RSA 265:4), Resisting Arrest [M] (NH RSA 642:2), Identity Fraud [F] (NH RSA 638:26,I(A)), Felon in Possession of a Dangerous Weapon [F] (NH RSA 159:3), Violation of Probation [M] (NH RSA 504-A:4), Receiving Stolen Property [M] (NH RSA 637:7), Simple Assault [V] (NH RSA 631:2-a), Sale of a Controlled Drug [F] (NH RSA 318-B:2,I), Theft Willful Concealment [M] (NH RSA 637:3-a,II), Theft by Unauthorized Taking [M] (NH RSA 637:3). CW-1 has not been convicted of all the previously mentioned charges and most have been declined for prosecution. CW-1 has provided information related to criminal activity which has been corroborated by law enforcement. For example, when CW-1 first agreed to cooperate, CW-1 identified Conway and described Conway's pattern of behavior related to drug trafficking, which was consistent with evidence later developed in this investigation and described herein.

[9]  "A" is believed by investigators to refer to Alton Ryan.

- TT-7651: I have 15 left right now i dont know what you were paying i charge my customers 150
- TT-7903: I'll take them at 150
- TT-7651: Ok when do u think u can be here
- TT-7651: Ok
- TT-7903: About 45 mins

17.     In the above conversation, I believe Conway asked Hull if he could visit the Target Premises to obtain twenty 10-gram cylindrical packages of heroin/fentanyl, commonly referred to as "sticks." Hull replied that she only had fifteen left, which I believe was a reference to the number of "sticks" of heroin/fentanyl she had left. Conway and Hull then agreed upon the price of $150 per 10-gram package of heroin/fentanyl.

18.     At approximately 12:33 p.m., surveillance units observed Conway arrive at the Target Premises and enter the shop. Conway was inside for only a few minutes before departing the area. Following his departure, an outgoing text message was intercepted over TT-7903 to CW-1 which read, "It's Alton's stuff and it's the last of it." I believe this confirmed that Conway obtained heroin/fentanyl from the Target Premises after facilitating the deal with TT-7651. Also, this message suggested Hull sold her remaining heroin/fentanyl and any future possession of heroin/fentanyl would be an indicator that Hull was re-supplied.

19.     Later that evening, at the direction of law enforcement, CW-1 met with Conway in Concord, New Hampshire and Conway provided CW-1 with approximately 150 grams of a substance believed to be heroin/fentanyl in exchange for $2,800 – resulting in a reasonable profit for Conway. CW-1 subsequently turned over the stick formed tan colored cylinders consistent with my training and experience to be heroin/fentanyl to law enforcement after the transaction. I believe, based on the interceptions described above and other interceptions in between Conway's visit to the Target Premises and meeting with CW-1, that the heroin/fentanyl obtained by CW-1 was the same product provided to Conway at the Target Premises.

20.     On March 18, 2023, law enforcement directed CW-1 to contact Conway over TT-7903 and request to purchase 180 grams of heroin/fentanyl. These communications were intercepted by law enforcement over TT-7903. Soon after the request from CW-1, law enforcement

intercepted the following text message conversation between TT-7903 and TT-7651 which concluded at 4:12 p.m.:

- TT-7903: Hey serene. How [sic] you trip went well. Any advance [sic] you got more in? I was looking for 18
- TT-7651: Ill let you know i only have 10 right now trying to get more today
- TT-7903: Would you take 1700 for the ten? I just got made the offer
- TT-7651: Sure
- TT-7651: When would u be here
- TT-7903: 615 or earlier... Maybe 6?

21.     In the above conversation, I believe Conway asked Hull if she had obtained more heroin/fentanyl since his last visit two days earlier, to which she replied in the affirmative. Conway initially asked for eighteen "sticks," or 180 grams of heroin/fentanyl, but ultimately settled on ten since Hull had apparently already sold the rest of the unknown quantity she had recently obtained. Conway and Hull then agreed upon the price of $170 per 10-gram package of heroin/fentanyl and meeting time around 6:00 p.m.

22.     At approximately 6:00 p.m., at the direction of law enforcement, CW-1 met with Conway in Concord, New Hampshire and "fronted," or provided upfront, $1,700 to Conway. Conway then departed his meeting with CW-1 and was followed by law enforcement to the Target Premises. Surveillance units observed Conway enter the shop and exit approximately six minutes later. He was then followed back to where CW-1 was waiting and provided him/her with approximately 100 grams of stick formed tan colored cylinders consistent with my training and experience to be heroin/fentanyl. I believe this confirmed that Hull utilized TT-7651 to facilitate the sale of heroin/fentanyl to Conway who in turn distributed the controlled substance to CW-1.

23.     During the morning of March 26, 2023, law enforcement directed CW-4 to arrange the purchase of methamphetamine with Hull over TT-7651. CW-4 provided a screenshot of the text messages which were manually confirmed to have been sent to and from TT-7651. The text messages are consistent with the way CW-4 often makes requests to purchase methamphetamine through Hull at the Target Premises:

- CW-4: Can I come by for an oil change, please.

- TT-7651: Let me i only have dark oil
- CW-4: Tthats [sic] kinda what I was looking for anyway
- TT-7651: Ok

24.     Based on my training and experience, I believe CW-4 made an encoded request to purchase methamphetamine – CW-4's typical order – from Hull over TT-7651. CW-4 told investigators that "dark oil" referred to heroin/fentanyl.   CW-4 was then directed by law enforcement to inform Hull that CW-4 wanted the heroin/fentanyl.

25.     Later that day at approximately 3:55 p.m., CW-4 was directed by law enforcement to make a recorded phone call to Hull over TT-7651 to confirm the previously arranged purchase of heroin/fentanyl. Law enforcement visually observed CW-4 dial TT-7651. The following conversation took place, wherein CW-4 informed Hull of his/her estimated arrival to the Target Premises and they agreed to discuss when Hull would be obtaining more "tina," a common term used to reference methamphetamine:

- Hull: Hello?
- CW-4: Hey, I'm about ten minutes out
- Hull: Ok
- CW-4: Umm, ya an idea when you're gonna get some tina back in
- Hull: Hmm, I'll talk to you when you get here
- CW-4: Alright, alright see you in a few

26.     Following the above conversation, CW-4 was followed to the Target Premises and observed by surveillance units entering the shop. CW-4 was inside for approximately 15 minutes. CW-4 then met with law enforcement and turned over approximately 40 grams of stick formed tan colored cylinders of substance based off my training and experience to be heroin/fentanyl .   CW-4 stated he/she received the substance from Hull inside the Target Premises in exchange for $700.

27.     During a subsequent debrief of CW-4, he/she stated that upon arrival to the Target Premises, the front door was unlocked so he/she entered and proceeded to Hull's office. CW-4 requested to purchase 6-8 "sticks" of heroin/fentanyl but Hull only had four remaining. Hull expressed that she would be resupplied later in the day. Hull also informed CW-4 that the cartel

would no longer supply her with methamphetamine but she intended to order some over the dark web. Additionally, CW-4 observed another female inside the Target Premises with Hull.

28.      A review of the surreptitious video recording conducted by CW-4 revealed Hull and the other female were monitoring a CCTV system with exterior cameras located on the exterior of the shop. I believe this is likely a system utilized by Hull in an attempt to detect law enforcement surveillance in the area.

29. On April 11, 2023, law enforcement directed CW-4 to contact TT-7651 to request to purchase heroin/fentanyl from Hull. CW-4 contacted Hull through TT-7651. Soon after the request from CW-4, TT-7651 confirmed to CW-4 that she had "dark oil" in stock, which I knew through this investigation to be heroin/fentanyl. Through my training and experience, dark oil is referred to reference heroin/ fentanyl. At approximately 4:00 p.m., FBI surveillance observed Hull enter the Target Premises. At approximately 4:20 p.m., at the direction of law enforcement, surveillance units observed CW-4 enter the Target Premises. A short time later, CW-4 exited and returned directly to the predetermined meet location. CW-4 provided investigators with 40 grams of stick formed tan colored cylinders of a substance based off my training and experience to be heroin / fentanyl.

30.    A subsequent debrief of CW-4 revealed the following: CW-4 purchased 4 pressed fentanyl sticks, equating 40 grams, directly from Hull for $800. CW-4 and Hull completed the transaction inside the Target Premises in her private office area. CW-4 additionally observed Hull utilize a black duffle bag inside the room, which CW-4 estimated contained a minimum of 30 additional pressed tan fentanyl sticks, estimated to be 10 grams each.

31.    For the reasons described above, I believe Hull stores controlled substances, proceeds from the distribution of controlled substances, and other items of evidentiary value inside the

Target Premises.

## **TRAINING AND EXPERIENCE**

32.    Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency.

33.    It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

34.  Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax

returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging

materials, computer hardware and software). Second, the individual may no longer realize he/she

still possesses the records or may believe law enforcement could not obtain a search warrant to

seize the evidence. Lastly, it is common for individuals to set aside or store such records, and

because they generally have no immediate need for the records, they are often forgotten. To law

enforcement, however, all these items may have significance and relevance when considered in

light of other evidence.

35.     Additionally, drug traffickers must maintain telephone and address listings of

clients and suppliers and keep them immediately available in order to efficiently conduct their drug

trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the

phones they use in order to keep track of them. They may also collect court papers and other

documents about customers who they believe may be cooperating with law enforcement

authorities in order to protect themselves or attempt to intimidate potential cooperators.

36.     It is also a generally common practice for traffickers to conceal at their residences,

or other places they access frequently, large sums of money, either the proceeds from drug sales

or monies to be used to purchase controlled substances. Individuals who distribute controlled

substances often use cash or readily transported assets which are used as cash equivalents like pre-

paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature

of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug

traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for

controlled substances. They may also use banks and wire companies, both foreign or domestic, to

launder and transfer funds to co-conspirators. They may also use shipping companies and keep

records of shipments of goods bought with drug proceeds. Records relating to income and

expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

37.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

38.     Often, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

39.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and U.S. currency are often located in a residence or on an individual's person.

40.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

41.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

42.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

43.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching

or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

44.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

45.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form

can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x

10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.  Although some of the records called for by this warrant might be found in the form of
user-generated documents (such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well. In particular, records of
how a digital device has been used, what it has been used for, who has used it, and who
has been responsible for creating or maintaining records, documents, programs,
applications and materials contained on the digital devices are, as described further in
the attachments, called for by this warrant. Those records will not always be found in
digital data that is neatly segregable from the hard drive image as a whole. Digital data
on the hard drive not currently associated with any file can provide evidence of a file
that was once on the hard drive but has since been deleted or edited, or of a deleted
portion of a file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave digital data on the hard drive that show what
tasks and processes on the computer were recently used. Web browsers, e-mail
programs, and chat programs often store configuration data on the hard drive that can
reveal information such as online nicknames and passwords. Operating systems can
record additional data, such as the attachment of peripherals, the attachment of USB
flash storage devices, and the times the computer was in use. Computer file systems can
record data about the dates files were created and the sequence in which they were
created. This data can be evidence of a crime, indicate the identity of the user of the
digital device, or point toward the existence of evidence in other locations. Recovery of
this data requires specialized tools and a controlled laboratory environment, and also
can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

46.   Based on my training and experience, I believe that it is likely that the Target Premises will contain smartphones that can be unlocked via the use of a fingerprint or facial recognition in lieu of a numeric or alphanumeric password. In my training and experience, users of Apple devices that offer Touch ID or facial recognition often enable it because it is a more convenient way to unlock the device than by entering a passcode. It is also a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

47.   In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID or facial recognition enabled, and a passcode must be used instead, such as: (1) when a certain amount of time has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID or facial recognition recently and the passcode or password has not been entered in the last few days. Thus, in the event law enforcement encounters

a locked Apple device, the opportunity to unlock the device via Touch ID or facial recognition exists only for a short time.

48.     The passcodes that would unlock the devices found within the Target Premises are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor or put the device's camera in front of the user's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints or facial profile of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

## SEALING REQUEST

49.     I submit that there is reasonable cause to seal all documents related to this warrant because I believe premature disclosure may cause adverse results, including endangering the safety of cooperating witnesses or law enforcement agents, flight of Hull or others from prosecution, and destruction of evidence.

## CONCLUSION

50.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of 21 U.S.C. §§ 841 & 846 [Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances] committed by Serene Hull and others will be found by searching the Target Premises, further described in Attachment A. Based upon my training and experience I believe that the items set forth in Attachment B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by Serene Hull.

/s/ Matthew B. Flynn
Matthew B. Flynn, Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Apr 19, 2023**

Time: **4:25 PM, Apr 19,** 2023

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Premises to be Searched**

Unit A of the one level, industrial building located at 126 Hall Street in Concord, New Hampshire ("Target Premises").

The premises to be searched also includes the areas on the curtilage of the property that are attributable to occupants of Unit A such as floor, wall and combination safes, lockers, briefcases, containers, and trash areas; and the persons of adults associated with Unit A located at the premises at the time of the execution of this search warrant.



(Front Entrance 4/10/2023)



(Rear entrance 4/10/2023)

**ATTACHMENT B**
**Items to be Seized**

1.  Controlled substances including, but not limited to methamphetamine or fentanyl;

2.  Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.  Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by Serene Hull and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.  Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.  Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.  Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.  Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.  Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.  Weapons to include handguns, rifles, shotguns, hand crafted guns, explosive devices, etc., and ammunition in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances or possessed by a prohibited person;

10. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence,

delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Serene Hull, Alton Ryan, or others, business entities in which they are stakeholders, or co-conspirators; and

12. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13. For the cellular telephones used primarily by Serene Hull, I seek to search the telephones for:

   a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

   b. Information associated with firearms, weapons, or ammunition;

   c. lists of customers and related identifying information;

   d. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

   e. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

   f. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

   g. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

   h. all bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

   i. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the Target Premises described in Attachment A,

law enforcement personnel are authorized to press the fingers (including thumbs) of Serene Hull,

if found at the Target Premises, to the fingerprint sensor of the devices respectively believed to be used by her for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. Compelling the unlocking of the devices using facial recognition is also permitted.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.